UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| SOUTHERN CALIFORNIA PUBLIC POWER AUTHORITY, *et al.,* | § § § § § | |
| Plaintiffs, | § § | |
| v. | § § | |
| ULTRA RESOURCES, INC., | § § | Civil Action No. 4:19-cv-00090 |
| Defendant/Counter-Claimant, | § § | Hon. Vanessa D. Gilmore |
| v. | § § | |
| SOUTHERN CALIFORNIA PUBLIC POWER AUTHORITY, *et al.,* | § § § § | |
| Counter-Defendants. | § § § | |
| GRIZZLY OPERATING, LLC f/k/a VANGUARD NATURAL RESOURCES, LLC | § § § § | |
| Debtors, | § § | |
| v. | § § | |
| ULTRA RESOURCES, INC., | § § | |
| v. | § § § | |
| Claimant. | § | |

**ULTRA RESOURCES, INC.'S
CONSOLIDATED RESPONSE TO PLAINTIFF/COUNTER-DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT**

TO THE HONORABLE COURT:

Ultra Resources, Inc. ("Ultra") files this Consolidated Response to Plaintiff/Counter-Defendants' Motions for Summary Judgment and would show:

1

**INTRODUCTION**

1.   Ultra's Motion for Partial Summary Judgment[1] addresses all of the arguments advanced by the Southern California Public Power Authority ("SCPPA") and the Turlock Irrigation District ("Turlock") in their Motion for Summary Judgment,[2] as well as arguments made by Vanguard Natural Resources, LLC ("Vanguard") in its nearly identical brief.[3] Accordingly, in response, Ultra incorporates by reference the arguments and authorities contained in its Motion.  Only a few additional comments are in order.

**ARGUMENT**

2.   Ultra, now joined by other current and former working interest owners, moved for partial summary judgment on the grounds that the Supplemental Accounting Agreement ("SAA") unambiguously requires that allocation of the net profits interest ("NPI") obligation be made based on proportionate net profits.  That construction is sensible: the NPI individually burdens each of the subject leases owned by the parties, so allocating on any other basis would result in an unbalanced redistribution of the NPI obligation.   There is no support in the SAA, contemporaneous evidence, or logic for the notion that the parties intended such a redistribution.

3.   Nevertheless, a few working interest owners (SCPPA, Vanguard, and Turlock) argue the allocation should be based on gross revenue, without regard to expenses and thus without regard to a party's profits.  Even parties that lose money would bear a portion of the NPI, even when it is only _other_ parties' profits that results an NPI payment in the first place.  Not only is there is no textual support for this illogical construction, the SAA expressly says otherwise in provisions that SCPPA, Turlock, and Vanguard do not even acknowledge, much less refute.

---

[1] Dkt. No. 68 in Ultra's bankruptcy adversary proceeding and Dkt. No. 1367 in Vanguard's bankruptcy.
[2] Dkt. No. 51.
[3] *In re Vanguard Natural Resources, LLC, et. al.*, Case No. 17-30560, Dkt. No. 1363.

8233868v1

4.     In reality, their token discussion of the SAA is simply a fig leaf to make their "collateral estoppel" argument seem palatable and to make it less obvious that their hopes entirely depend on persuading this Court to ignore the merits altogether. But, the Court is not required to wear the blinders they urge upon it or, worse, hold its nose and endorse a construction it believes to be wrong. Wyoming law is clear that collateral estoppel is to be narrowly applied and always subject to the constraints of equity, even when all its elements are met – and here, they are not. The simple fact is that this issue was not decided in Wyoming and, even if it were, would not bind this Court to implement – in an entirely different, more consequential, and lasting context – the absurd result they seek.

**A.    Collateral Estoppel Does Not Bind This Court**

5.     Ultra will not repeat the arguments contained in its Motion at ¶¶50-93 and, in particular, the detailed discussion concerning the *Hartman* lawsuit. By way of summary, suffice it to say that:

- Although collateral estoppel requires a prior direct determination of the identical issue, the Wyoming judgment did not declare anything about the meaning of the SAA nor how future allocation should be made between working interest owners.

- The Wyoming court merely applied a 30% settlement credit, which under Wyoming law is an equitable determination.[4] While that figure is very close to the figure that the NPI owners suggested would be appropriate if a gross revenue theory were applied (30.17%), it is not exactly the same.

- Nor did the Supreme Court, on review of the judgment, interpret the SAA. It did not even employ the *de novo* standard of review required had it been reviewing a contract construction. It merely found that the trial court's equitable judgment as to the credit was not "clearly erroneous" or an "abuse of discretion."[5]

- The settlement credit, in the larger context of the case, was a collateral matter that was not the subject of meaningful briefing by any party (including the predecessors of the counter-defendants), nor did any party remotely anticipate that the ruling

---

[4] Under Wyoming law, settlement credits are within the discretion of the trial court and "controlled by principles of equity." *Cargill, Inc. v. Mountain Cement, Co.*, 891 P.2d 57, 67 (Wyo. 1995).
[5] *Ultra Resources, Inc. v. Hartman*, 226 P.3d 889, 935 (Wyo. 2010).

3

8233868v1

would later be argued to dispose of the entire issue of working interest owner allocations.

- This Court will not find in the *Hartman* case anything like the briefing or argument in <u>this</u> case. This is the first time these issues have been raised and, in fairness, could have been expected to be raised, in this level of detail.

The list goes on, but will not be repeated. It is all in Ultra's motion.

6. These are not mere quibbles. For collateral estoppel to apply, the "issue sought to be precluded must have been necessary or essential to the disposition reflected in the earlier judgment." *Delgue v. Curutchet*, 677 P.2d 208, 214 (Wyo. 1984). There was no <u>direct</u> determination of the <u>identical</u> issue in the *Hartman* case, as required by Wyoming law. Not only is there no express declaration concerning the SAA's allocation provisions in the trial court's judgment, no such determination was "necessary or essential" to the judgment. Indeed, throughout the Wyoming Supreme Court's opinion, the Questar/Wexpro settlement credit is analyzed entirely under the principle that the trial court had "equitable jurisdiction and discretion" to determine the amount of the set-off. *See, e.g., Hartman*, 226 P.3d at 934–35. The fact that the judgment was reviewed on an abuse of discretion standard, not the *de novo* standard applicable to contract construction simply demonstrates that a <u>legal</u> determination of the meaning of the SAA was neither necessary nor essential. Further, because this issue arose only in the context of an equitable determination of a settlement credit, Ultra was denied the benefit of the *de novo* appellate review to which it would have been, and should be now, entitled on any interpretation of an unambiguous contract.

7. Moreover, even were all the elements of collateral estoppel met, which they are not, collateral estoppel is not simply a mechanical test that requires this Court to blindly rubber stamp the purported result in a separate case. Entirely absent from counter-defendants' briefing is any analysis of the equitable principles that not only permit this Court to examine the SAA, but require it to do so.

4

8233868v1

8. The central rule is that collateral estoppel should not be applied to work an injustice. *Delgue*, 677 P.2d at 215–16. Thus, "[e]ven if the elements of collateral estoppel are met, several exceptions may apply…." *Elliot v. State*, 247 P.3d 501, 503 (Wyo. 2011).

9. When it comes to those exceptions, Wyoming follows the guidance contained in the RESTATEMENT OF JUDGMENTS (SECOND) on the application of collateral estoppel. *Id.* Even where the elements of collateral estoppel are satisfied, relitigation is not precluded where, for example:

- The party against whom preclusion is sought could not, as a matter of law, have obtained review of the judgment in the initial action.

- The issue is one of law and (a) the two actions involve claims that are substantially unrelated, or (b) a new determination is warranted in order to take account of an intervening change in applicable legal context or to otherwise avoid the inequitable administration of the laws;

- A new determination of the issue is warranted by differences in the quality or extensiveness of the procedures followed in the two courts….

- The party against whom preclusion is sought had a significantly heavier burden of persuasion with respect to the issue in the initial action than in the subsequent action…

- There is clear and convincing need for a new determination of the issue…because it was not sufficiently foreseeable at the time of the initial action that the issue would arise in the context of a subsequent action….

*Id.* (recognizing Wyoming law follows the exceptions contained within RESTATEMENT OF JUDGMENTS (SECOND) §28). The Restatement contains additional factors in Section 29, all of which mitigate against counter-defendants, such as whether:

- "The person seeking to invoke the doctrine…could have effected joinder in the first action between himself and his present adversary."

- "The determination relied upon as preclusive was itself inconsistent with another determination of the same issue"

- "Other compelling circumstances make it appropriate that the party be permitted to relitigate the same issue."

5

RESTATEMENT OF JUDGMENTS (SECOND) §28 (1982).

    10.    Even without going one-by-one, it is apparent that a number of these exceptions are applicable:

- The trial court made no determination concerning the manner of future allocations and in a footnote that the counter-defendants fail to quote, the Wyoming Supreme Court expressly declined to opine on future allocations.[6]

- The predecessors of SCPPA, Turlock and Vanguard were parties to the *Hartman* case, yet did not advance the argument they now assert.

- Allocating on a gross revenue basis would be inconsistent with the simultaneous determination by the Wyoming courts that the NPI proportionally burdens each lease and therefore all owners are "responsible for their proportionate shares of net profits."[7]

- The settlement credit was determined under principles of discretion and equity – far different from the legal standard applicable to contractual interpretation.

- A different and far less favorable standard of review was applied on appeal of this issue in *Hartman* than would be applied by this Court or any reviewing Court.

- There was a markedly different, and lesser, incentive to litigate this issue in the first case and there is no indication that any party believed that the Wyoming court's judgment would define the future allocation method as between the remaining working interest owners.

Simply put, nearly every factor mitigates against the application of collateral estoppel, even if the elements were met.

    11.    There is one last point that highlights the fundamental inequity of counter-defendants' position. The counter-defendants argue, correctly, that, in this case, the interpretation of an unambiguous contract is a *question of law* for the Court.[8] Their motions for summary judgment, and their response to Ultra's motion, are requests that this Court make a *legal* interpretation concerning the SAA. Yet, their collateral estoppel argument attempts to bind

---

[6] *Hartman*, 226 P.3d at 935 n. 23.
[7] *Id.* at 933.
[8] SCPPA/Turlock Motion for Summary Judgment [Dkt. No. 51] at ¶¶66-67; Vanguard Motion for Summary Judgment [Dkt. No. 1363] at ¶44.

8233868v1

Ultra to, at best, an implicit finding by a Wyoming trial court as part of what was expressly an *equitable* inquiry, and one which was reviewed only on an abuse of discretion standard.

12. Why is this a problem? **Simple: if this Court applies collateral estoppel and declines to consider the merits, it will mean that at no point did Ultra ever receive the benefit of a <u>legal</u> determination of the meaning of the contract, and at no point did (or will) Ultra ever have the benefit of *de novo* review to which it would be entitled for such a finding.** No Court will ever have applied the appropriate legal standard to interpreting the contract and Ultra would have been entirely denied appellate review under the applicable standard. Put another way, just as a civil finding of liability would not compel a finding of "guilty" in a criminal proceeding with its higher burden of proof, an equitable judgment that is, at best, 'not clearly erroneous,' cannot dispose of a legal issue which demands not only a legal determination, but would entitle the losing party to *de novo* review.

**B.     Counter-Defendants Ignore the Plain Language of the SAA**

13. SCCPA, Turlock, and Vanguard, who argue for allocation based on gross revenue, provide no explanation why the SAA drafters would have intended to redistribute the NPI burden in such a manifestly irrational manner. Their only argument is the demonstrably false one that the SAA provides "no mechanism" to allocate expenses to the parties. That just isn't accurate.

14. The SAA expressly provides that each party, after having contributed 5% of its gross revenue, is entitled to receive back its proportionate share of its expenses. Ultra discussed this at length in its motion at ¶¶27-32. What is "left over," and used to pay the NPI as calculated under the NPC, is, by definition, 5% of each party's net profits. SCPPA, Turlock, and Vanguard's briefing ignore this language entirely. It is not even discussed, much less disputed. Their position is entirely premised on the incorrect assertion that the SAA provides no basis for

7

attributing expenses to parties. Beyond pointing out the plain language that does, indeed, provide this mechanism, there is little left to say.

15. However, it is worth noting one final point, which is that these parties ignore the profoundly negative consequences to themselves of their own construction. They completely fail to examine or explain how the allocation would work if their construction were accepted. Consider this:

- Vanguard, SCPPA and Turlock concede, indeed advocate, that the SAA requires each party to remit 5% of its gross revenue to Ultra as the first step of the NPI accounting – not some "share" of the NPI obligation, but gross revenue without respect to whether an NPI is even owed.[9]

- They then assert that the SAA provides "no procedure within the four corners of the agreement for allocating *expenses* among the parties…"[10]

For the reasons listed above, they are wrong about the second point, but let us assume for the moment that they were correct. It would leave them even worse off.

16. If each party is obligated to remit 5% of its gross revenue and, as they assert, there is no mechanism by which a party is credited with its expenses, then *they would be obliged,* ad infinitum*, to divert 5% of their gross revenue to the NPI account and receive nothing back by way of credit for their expenses*. The consequences, particularly to themselves, of this interpretation are profoundly negative. If no party receives a "refund" of its incurred expenses, then there would be an ever-growing and never-distributed positive balance in the NPI account.[11] By denying that the SAA provides any mechanism to credit parties for their expenses (because

---

[9] SCPPA/Turlock Motion, Dkt. No. 51 at ¶72; Vanguard Motion, Dkt. No. 1363 at ¶45.
As pointed out by Pinedale and Standard, the SAA does indeed require this "up front" payment. Ultra agrees. No party has actually made such payments, and in the interest of efficiency, Ultra has historically billed the parties on the basis of the "net calculation." However, if what is necessary to compel the working interest owners to fund their share of the NPI obligation is to require the full, upfront payment of 5% of gross revenue and then dole back out their proportionate expenses, then so be it.
[10] SCPPA/Turlock Motion, Dkt. No. 51 at ¶77; Vanguard Motion, Dkt. No. 1363 at ¶51.
[11] The NPI payment, if any were owed, would be based on the net profit calculation required by the NPC.

they do not want Ultra to receive such a credit), they also deny that credit to themselves. They would be hoisted by their own interpretive petard.

17. Ultra's interpretation, on the other hand, recognizes that the SAA plainly does provide for a credit back to the parties based on their own expenses. That is the four-part distribution scheme discussed in Ultra's motion at ¶¶30-32, which includes reducing the NPI account not only by 5% of the joint account expenses but also with the proportionate expenses that each party may have incurred in *other* operations. As Ultra explained in its motion, the SAA provides that each party is reimbursed for its share of any operation that is subject to the NPI. What is left is net profit.

## CONCLUSION

18. The SAA is clear and should be construed according to its plain language and in a manner consistent with the obvious intent of the parties. SCPPA, Turlock and Vanguard's opportunistic effort to use the prior Wyoming suit with to bootstrap themselves into what they (incorrectly) believe would be a better outcome (for themselves) should be rejected.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Ultra respectfully requests that the Court grant its Motion for Partial Summary Judgment, deny the Motions for Summary Judgment filed by SCPPA, Turlock and Vanguard, and award any additional relief to which it may be entitled.

Dated this 26th day of July 2019.

        /s/ Joseph G. Thompson III
        Joseph G. Thompson
        State Bar No. 00788534
        Federal I.D. No. 16780
        **PORTER HEDGES LLP**
        1000 Main Street, 36th Floor
        Houston, Texas  77002
        Telephone: (713) 226-6704
        Facsimile: (713) 226-6304
        Email: joe.thompson@porterhedges.com
        *Counsel for Ultra Resources, Inc.*

**OF COUNSEL:**

Andrew B. Raber
State Bar No. 24063730
Federal I.D. No. 2979653
**PORTER HEDGES LLP**
1000 Main Street, 36th Floor
Houston, Texas  77002
Telephone: (713) 226-6745
Facsimile: (713) 226-6345
Email: araber@porterhedges.com

## CERTIFICATE OF SERVICE

      I certify that on this 26th day of July 2019, a true and correct copy of the foregoing document has been served via electronic notification to all parties of record.

        /s/ Joseph G. Thompson III

8233868v1